IN THE SUPREME COURT OF THE STATE OF IDAHO

Docket No. 51857

| IDAHO STATE BAR, | ) | |
|---|---|---|
| | ) | |
| Petitioner-Appellant-Cross Respondent, | ) | Boise, January 2025 Term |
| | ) | |
| v. | ) | Opinion filed: April 2, 2025 |
| | ) | |
| JUSTIN B. OLESON, | ) | Melanie Gagnepain, Clerk |
| | ) | |
| Respondent-Respondent on Appeal-Cross Appellant. | ) | |
| | ) | |

Appeal from the Professional Conduct Board Hearing Committee of the Idaho State Bar.

The decision of the Professional Conduct Board Hearing Committee is affirmed in part and reversed in part, and its sanction of a public reprimand is vacated. Respondent is disbarred from the practice of law.

Joseph N. Pirtle, Idaho State Bar Counsel, Boise, for Appellant-Cross Respondent. Joseph N. Pirtle argued.

Points Law, PLLC, Boise, and Johnson May, Boise, for Respondent-Cross Appellant. Michelle R. Points argued.

_____

MOELLER, Justice

This is an attorney discipline case grounded in a dispute that this Court first addressed in *Katseanes v. Katseanes*, 171 Idaho 478, 522 P.3d 1236 (2023). Following resolution of that appeal, the Idaho State Bar ("ISB") filed a complaint alleging that Justin Oleson had violated nine of the Idaho Rules of Professional Conduct ("Rules" or "Professional Rules"). After an evidentiary hearing, the Hearing Committee of the Professional Conduct Board ("Committee") determined that Oleson violated three ethical rules—Rules 1.7(a)(2), 3.4(c), and 8.4(d)—and concluded that a public reprimand would be an appropriate sanction. The Committee also found that the ISB had not proved by clear and convincing evidence that Oleson had violated the six remaining rules: Rules 1.2(a), 1.3, 1.4, 3.3(a)(1), 4.1, and 8.4(c).

1

The ISB appeals the Committee's determination that Oleson did not violate Rules 1.2(a), 1.3, 1.4, 4.1, and 8.4(c)[1]. It also challenges the sanction imposed by the Committee, a public reprimand, as being too lenient. Oleson cross-appeals the Committee's determination that he violated Rules 1.7(a)(2), 3.4(c), and 8.4(d). He also argues that the Committee abused its discretion by taking judicial notice of several documents before issuing its decision. For the reasons discussed below, we reverse the Committee's decision in part, affirm it in part, and impose a more severe sanction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The underlying allegations of professional misconduct stem from Oleson's representation of Jeff Katseanes in a post-divorce matter against his ex-wife, Judy Katseanes. Four years after their divorce, Judy filed a civil complaint against Jeff, alleging that he had failed to make required spousal support payments to her. On January 28, 2020, the district court granted Judy's summary judgment motion and entered a $90,633.83 judgment against Jeff; however, that amount was later amended to $106,468.25. On July 15, 2020, Judy filed a Motion for Entry of a Qualified Domestic Relations Order ("QDRO") to partially satisfy the judgment she had obtained against Jeff for unpaid spousal support. The funds sought by the QDRO were held in Jeff's retirement account managed by Rudd & Company, PLLC, a regional accounting firm. At that same time, roughly 65% of Jeff's wages were being garnished to pay the outstanding spousal support.

On September 9, 2020, Jeff filed for bankruptcy, which stayed the pending civil case; however, the bankruptcy was subsequently dismissed on December 10, 2020. While Oleson did not represent Jeff in the bankruptcy proceedings, he represented Jeff in all the post-divorce proceedings. During those proceedings, Jeff became unable to pay Oleson for his legal work. This came to a head on September 4, 2020, when Oleson requested that Jeff pay him "at least $5,000" for legal work he had completed. Jeff responded via letter, stating that he could pay the fees only if he could access his retirement funds managed by Rudd & Company. At that time, Jeff understood that there was an existing hold on his retirement funds preventing him from accessing them.[2] Jeff stated: "I want to pay my bill but I have to get that money."

On January 6, 2021, the district court conducted a hearing on Judy's motion for entry of a QDRO. Although Oleson was present, Jeff was out of town for work and could not attend. During

---

[1] The ISB does not appeal the Committee's determination that Oleson did not violate Rule 3.3(a)(1).

[2] It is unclear whether this hold was imposed by the district court or by Rudd & Company due to an internal policy. Regardless, Jeff knew there was a hold on his account.

the hearing, the district court orally granted the motion for the QDRO. Oleson repeatedly confirmed his understanding of the court's ruling during the hearing, acknowledging that Jeff "lost" on the matter: "I understand that. The [c]ourt ruled against us."; "[Jeff]'s lost everything, especially now since you've just granted that his whole retirement goes to [Judy]."; "I understand we've lost."

Shortly after the hearing, Oleson called Jeff to inform him that the district court had granted the motion for a QDRO so that his retirement funds could be used to satisfy his spousal support obligations. The exact details of that phone call are disputed. On the one hand, Jeff testified that Oleson informed him that there was no current hold on his retirement funds, and that he needed to "act quickly" to "get the money pulled" so that he could pay Oleson with the funds. Jeff also testified that Oleson did not inform him of any potential consequences for withdrawing the funds. On the other hand, Oleson testified that he did not directly tell Jeff to withdraw the money from the retirement account but admitted that they discussed it. Oleson also maintained that he believed the district court's oral grant of the QDRO was not effective until the district court signed and entered the order. He testified that he told Jeff: "at some point in time" the court would sign the QDRO, "[w]hich would then assign Jeff[']s retirement account" to Judy. Despite the conflicting accounts of the phone call, one thing is uncontested: shortly after the phone call with Oleson, Jeff contacted Rudd & Company and requested to withdraw all the money from his retirement account.

A week later, Oleson sent Jeff a letter noting his understanding that Jeff had initiated the withdrawal of his retirement funds from Rudd & Company, and requested that he be paid with the proceeds:

> If you did, hopefully you can get those funds to me ASAP and get me paid off and we can do something else with it. Otherwise, you will be getting the QDRO and having the retirement taken.

On that same day, a representative from Rudd & Company, Erin Dupree, called Oleson to discuss Jeff's request to withdraw the retirement funds. According to an affidavit filed by Dupree, Oleson told her that there were "no holds" on the retirement funds, that no QDRO had been entered, and that she "should feel free to distribute the retirement funds" to Jeff.

On January 15, 2021, Rudd & Company distributed the retirement funds to Jeff, totaling $61,946.91 after deductions. Jeff then used $5,700 of that money to pay Oleson for his legal work. Oleson also received an additional $19,000 through Billie (Jeff's other ex-wife), to whom Jeff had given $50,000 of the retirement funds. Billie made these payments to Oleson on Jeff's behalf, and

3

Jeff testified that Oleson knew the funds came from the retirement account. These funds were deposited in the general account of Oleson's law firm and later spent, although Oleson later denied knowing of the deposits at the time. Oleson later acknowledged that it was "inappropriate" to deposit these funds into his firm's general account. He admitted that the funds "needed to go into [his firm's] trust account" and he "knew the judge was going to be upset," so he "wanted to try to preserve that so it was there." He also later testified that he "knew there were going to be problems" if Jeff withdrew the retirement funds.

On February 19, 2021, Rudd & Company informed Judy that all of the retirement funds had been withdrawn by Jeff. Subsequently, Judy filed an ex parte motion for a temporary order prohibiting Jeff from dissipating the retirement funds he had withdrawn, which the district court granted. On March 18, 2021, the district court held a hearing on Judy's motion for a restraining order, which it also granted. The court orally ordered Jeff to provide a complete accounting of the retirement funds by April 1, 2021, detailing what he had done with the money. The district court also confirmed that its previous ruling granting Judy's motion for a QDRO was effective on the day the motion was orally granted (January 6, 2021).

Jeff timely provided an accounting of the funds to Oleson, consistent with the district court's order. Yet, instead of filing the accounting with the court, Oleson filed an appeal on Jeff's behalf and submitted a letter to the court. The letter stated:

> This confirms that [Jeff] has complied with the court's order and brought to my office an accounting of the funds from his retirement account.
>
> However, as we have filed an Amended Notice of Appeal today, I do not feel it proper to provide an accounting to the court at this time, until the appeal is resolved. If the court still requires an accounting, I could provide one. However, I do not believe [Jeff] is required to do so at this time as this is now under appeal.
>
> If you have any questions please do not hesitate to contact me.

Oleson later testified that it was his "legal decision" not to file the accounting with the district court. He informed Jeff that the court would impose a stay based on the appeal and that the accounting would not be required, as Jeff "shouldn't have to comply with [the] court's orders until the stay is over." Oleson also testified that he did not discuss with Jeff the possibility that Jeff could serve jail time as a result of failing to timely file the accounting in compliance with the court's order. Moreover, Oleson did not send Jeff a copy of the letter that he filed with the court in lieu of the accounting until after it had been filed with the court.

4

Subsequently, Judy filed a motion to compel Jeff to provide the accounting, as well as a motion for contempt against Jeff for his failure to provide the accounting in a timely manner. On April 21, 2021, the district court granted the motion to compel, ordering Jeff to supply the accounting of the retirement funds by April 26, 2021.

Oleson signed and filed the accounting on April 27, 2021. The accounting reflected the $5,700 that was paid to Oleson from the retirement funds. However, Oleson did not disclose that he had received an additional $19,000 from Billie. Oleson has testified that he was not yet aware of these payments due to his firm's antiquated accounting system. On June 1, 2021, Judy filed a motion for an order of disgorgement directing Oleson to disgorge the $5,700 in fees that he had received from the retirement funds. The district court granted the motion but stayed the order pending Jeff's appeal.

On June 3, 2021, the district court held a hearing on Judy's contempt motion against Jeff. Oleson continued to represent Jeff in the matter. Notably, Oleson did not call any witnesses to rebut the allegations that Jeff failed to timely supply the court with the accounting and he did not disclose his role in the decision to delay filing the report with the court. The court ultimately found Jeff to be in contempt and sentenced him to a maximum of five days in jail, but again stayed the sentence pending the appeal of the case.

In 2022, the Idaho Supreme Court heard the appeal of the contempt and the disgorgement orders in *Katseanes v. Katseanes*, 171 Idaho 478, 522 P.3d 1236 (2023). We affirmed the district court in both instances, holding that the QDRO was effective at the time it was orally granted by the district court, and upholding the order of contempt. *Id*. at 485, 488, P.3d at 1243, 1246. As a result, Jeff ultimately served three days in jail.

Following the appeal, Judy's attorney filed a grievance with the ISB alleging that Oleson had violated the Professional Rules. On September 14, 2023, the ISB filed a complaint alleging that Oleson had violated nine Professional Rules relating to his representation of Jeff: Rules 1.2(a), 1.3, 1.4, 1.7(a)(2), 3.4(c), 4.1, 8.4(c) and 8.4(d). The ISB requested a sanction of disbarment. Oleson filed an answer denying each allegation of professional misconduct. The parties engaged in discovery and the case proceeded to an evidentiary hearing before the Committee. Following the evidentiary hearing, the Committee entered an order allowing the parties to file motions for judicial notice and written closing statements. The ISB filed a Motion for Judicial Notice and a supporting memorandum, requesting that the Committee take judicial notice of several exhibits,

including transcripts of district court hearings and this Court's opinion in *Katseanes*. Oleson opposed the motion.

On March 29, 2024, the Committee issued its Findings of Fact, Conclusions of Law, and Order (the "Decision"). The Committee took judicial notice of the requested portions of the ISB's exhibits. The Committee concluded that the ISB had proved by clear and convincing evidence that Oleson had violated Rules 1.7(a)(2), 3.4(c), and 8.4(d), and determined the appropriate sanction to be a public reprimand. However, the Committee concluded that the ISB had not proved by clear and convincing evidence that Oleson had violated Rules 1.2(a), 1.3, 1.4, 3.3(a)(1), 4.1, and 8.4(c). After the Committee denied the motions to amend or alter the Committee's Decision submitted by both parties, each filed notices of intent to appeal the Decision. On May 23, 2024, the ISB appealed pursuant to Idaho Bar Commission Rule 511(K)(1); Oleson cross-appealed that same day.

## II. STANDARDS OF REVIEW

When this Court reviews an attorney discipline case, we "independently examine[] the record developed before the Professional Conduct Board to determine whether the evidence supports the findings and recommendations of the Board's hearing Committee." *Idaho State Bar v. Warrick*, 137 Idaho 86, 90, 44 P.3d 1141, 1145 (2002). We review the Committee's decision "to determine if it is clearly erroneous or arbitrary and capricious." *Id.*; *see also* I.B.C.R. 509(d)(9).

Professional misconduct must be proven by clear and convincing evidence. *Wilhelm v. Idaho State Bar*, 140 Idaho 30, 34, 89 P.3d 870, 874 (2004). However, the "burden is on the attorney petitioner to show that the evidence does not support the hearing committee's findings." *Idaho State Bar v. Frazier*, 136 Idaho 22, 25, 28 P.3d 363, 366 (2001) (citing *Idaho State Bar v. Tway*, 128 Idaho 794, 797, 919 P.2d 323, 325 (1996)). "If substantial and competent, though conflicting, evidence supports a trial court's findings of fact, those findings are not clearly erroneous." *Weitz v. Green*, 148 Idaho 851, 857, 230 P.3d 743, 749 (2010). "Whether a party presented sufficient evidence to meet the clear and convincing standard is a finding of fact that this Court will uphold if substantial and competent evidence supports it." *Snider v. Arnold*, 153 Idaho 641, 644, 289 P.3d 43, 46 (2012) (citations omitted).

In reviewing the Committee's sanction recommendation, this Court considers: (1) the nature of the violations; (2) aggravating and mitigating circumstances; (3) the need to protect the public, the courts, and the legal profession; and (4) the moral fitness of the lawyer. *Idaho State Bar v. Souza*, 142 Idaho 502, 506, 129 P.3d, 1251, 1255 (2006); *Idaho State Bar v. Clark*, 153 Idaho

349, 360, 283 P.3d 96, 107 (2012). The ultimate responsibility for assessing the facts and determining the sanction to be imposed rests with this Court. *Clark*, 153 Idaho at 355, 283 P.3d at 102.

## III. ANALYSIS

**A. The Committee erred because clear and convincing evidence supports ISB's claim that Oleson violated Rules 1.2(a) and 1.4 by failing to consult with Jeff about the consequences of not filing the accounting.**

In its Decision, the Committee concluded that there was not clear and convincing evidence that Oleson violated Rules 1.2(a) and 1.4, both of which pertain to an attorney's relationship with the client. In this case, the alleged violations of such Rules stem from Oleson's failure to discuss and inform Jeff of the potential consequences for failing to file the accounting of his retirement funds with the district court.

Rule 1.2, entitled Scope of Representation, provides that a lawyer must consult with the client before making certain decisions regarding how to carry out the representation:

> (a) Subject to paragraphs (c) and (d), a lawyer shall abide by a client's decisions concerning the objectives of representation and, *as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued.* A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation.

I.R.P.C. 1.2(a) (Emphasis added). The official comments to this Rule note that "[c]lients normally defer to the special knowledge and skill of their lawyer with respect to the means to be used to accomplish their objectives, particularly with respect to technical, legal and tactical matters." I.R.P.C. 1.2 cmt. 2.

Next, Rule 1.4, as referenced in Rule 1.2(a), sets forth the guidelines around communicating and consulting with clients:

> (a) A lawyer shall:
> (1) *promptly inform the client of any decision or circumstance with respect to which the client's informed consent*, as defined in Rule 1.0(e), is required by these Rules;
> (2) *reasonably consult with the client about the means by which the client's objectives are to be accomplished*;
> (3) keep the client reasonably informed about the status of the matter;
> (4) promptly comply with reasonable requests for information, including a request for an accounting as required by Rule 1.5(f); and
> (5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional Conduct or other law.

7

(b) *A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.*

I.R.P.C. 1.4 (Emphasis added).

The comments to Rule 1.4 provide that: "The client should have sufficient information to participate intelligently in the decisions concerning the objectives of the representation and the means by which they are pursued, to the extent the client is willing and able to do so." I.R.P.C. 1.4 cmt. 5. Additionally, "[i]n certain circumstances, such as when a lawyer asks a client to consent to a representation affected by a conflict of interest, the client must give informed consent." *Id.* Informed consent, in turn, is defined as: "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." I.R.P.C. 1.0(e).

In this case, certain facts are undisputed. On March 18, 2021, the district court ordered Jeff to provide it with an accounting that detailed what he had done with the withdrawn retirement funds. Jeff then timely produced an accounting to Oleson, well before the court ordered deadline of April 1, 2021. However, Oleson then opted not to file the accounting with the court and instead filed an appeal and a letter. In the letter, Oleson explained that, while Jeff had timely provided the accounting to him, he did not "feel it proper" to file the accounting. He stated that he did not "believe" Jeff was required to submit the accounting, due to the appeal he filed the same day that, in his view, stayed the proceedings.

There is some dispute over whether, or to what extent, Oleson conferred with Jeff about filing a letter instead of the accounting. Jeff testified that Oleson did not consult with him about the decision at all, and it caught him by surprise, while Oleson maintains that Jeff directed him to refrain from filing the accounting and that he discussed the ramifications of that action with Jeff. Evaluating the conflicting evidence before it, the Committee made several factual findings in its Decision. The Committee unequivocally found that Oleson "never discussed with Jeff the potential consequences of failing to file the accounting," and "did not inform Jeff that filing the letter instead of the accounting would violate the court order and could result in Jeff serving jail time." The Committee also found that Oleson told Jeff that he should not have to comply with the court order, due to the legal stay Oleson believed would take effect. Despite these factual findings, the Committee concluded that Oleson did not violate Rules 1.2(a) and 1.4. As discussed below,

8

because the Committee's own factual findings contradict its legal conclusion, we conclude that the Committee's determinations were arbitrary and capricious, and clearly erroneous.

We first examine the Committee's factual findings that Oleson "never discussed with Jeff the potential consequences of failing to file the accounting," and "did not inform Jeff that filing the letter instead of the accounting would violate the court order and could result in Jeff serving jail time." After an independent review of the record, we conclude that these findings are supported by substantial and competent evidence. Indeed, Oleson concedes that he did not discuss jail time as a potential consequence of disobeying the court's order by not filing the accounting. Oleson's own testimony demonstrates that he advised Jeff that he did not need to comply with the court order due to the purported stay that would take effect. Oleson also acknowledges that he informed Jeff that filing an appeal would stay his obligation to follow the court order and, therefore, Jeff "shouldn't have to comply." We find no error in the Committee's factual findings. Instead, we take issue with the Committee's legal conclusion that flowed from its own findings.

Having established that Oleson "never discussed with Jeff the potential consequences for failing to file the accounting" and "did not inform Jeff that filing the letter instead of the accounting would violate the court order and could result in Jeff serving jail time," we conclude that it is abundantly clear that Oleson violated Rules 1.2(a) and 1.4. These rules plainly require a lawyer to reasonably consult with their client about the consequences of an action so that the client may make an informed decision. *See* I.R.P.C. 1.2(a); I.R.P.C. 1.4. Simply put, because Oleson failed to consult with Jeff about the consequences of not filing the accounting as ordered, including the risk that he could go to jail for such actions, clear and convincing evidence supports the conclusion that Oleson violated Rules 1.2(a) and 1.4. To explicitly determine that Oleson did not consult with Jeff about the potential consequences of not filing the accounting, and yet conclude that Oleson did not violate Rules 1.2(a) and 1.4, is arbitrary and capricious, and clearly erroneous.

The Committee's decision also contains other conflicting factual findings and legal conclusions, which serve to further confirm our conclusion. In its Decision, the Committee found by clear and convincing evidence that Oleson had a conflict of interest, and that Oleson "should have notified [Jeff] of the conflict of interest that he had and obtained informed consent and or withdrawn as counsel. He did neither and [Jeff] went to jail for it." The substance of that conduct is addressed later in this opinion; however, because Oleson had a conflict of interest, he was required by Rule 1.4 to obtain Jeff's informed consent to continue his representation. Despite

9

Oleson's failure to do so, the Committee determined that Oleson did not violate Rule 1.4. The record demonstrates that this determination was arbitrary and capricious, and clearly erroneous. The record is clear that Oleson did not inform Jeff of his conflict of interest, and the Committee confirmed this fact in its Decision; indeed, Oleson admits he never mentioned his conflict of interest to Jeff. Oleson's failure to inform Jeff of his conflict, and obtain his informed consent to continue representing him, results in a clear violation of Rule 1.4.

For all these reasons, we conclude that the Committee's conclusion that Oleson did not violate Rules 1.2(a) and 1.4 was arbitrary and capricious, and clearly erroneous. Accordingly, we reverse the Committee's Decision as to these rules.

### B. The Committee erred because clear and convincing evidence supports ISB's claim that Oleson made a false statement of material fact to a third person, in violation of Rules 4.1 and 8.4(c).

The Committee also determined that there was not clear and convincing evidence that Oleson violated Rules 4.1 and 8.4(c). The ISB alleged that Oleson violated these rules by making false or misleading statements to Dupree, a third party, regarding the status of the QDRO entered by the district court.

Rule 4.1 states that: "in the course of representing a client a lawyer may not knowingly. . . make a false statement of material fact or law to a third person." I.R.P.C. 4.1. According to the official comments to that Rule, misrepresentations include "partially true but misleading statements or omissions that are the equivalent of affirmative false statements." I.R.P.C. 4.1 cmt. 1. In a similar vein, Rule 8.4(c) simply provides that it is "professional misconduct" for an attorney to "engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." I.R.P.C. 8.4(c). Not surprisingly, these rules often overlap—if an attorney's conduct violates Rule 4.1 by making a false statement of material fact, it is likely that such conduct also involves dishonesty, fraud, deceit, or misrepresentation, which Rule 8.4(c) similarly proscribes.

Here, the misconduct occurred when Oleson actively deceived Dupree, the Rudd & Company representative, by informing her that there were no holds on Jeff's retirement accounts. This conversation occurred shortly after the district court had orally granted Judy's motion for the QDRO pertaining to such funds. While Dupree did not testify as a witness before the Committee, an affidavit containing her account of the phone call was admitted as evidence in this proceeding, and the transcript of her testimony before the district court regarding the issue was provided to the

10

Committee[3] (both of which were part of the record from the underlying *Katseanes* case). According to Dupree, Oleson told her that "there were no holds on the retirement account, that there was no QDRO that was going to be entered and that [she] should feel free to distribute the retirement funds." In a subsequent letter to the ISB, Oleson conceded that he told Dupree that "it did not appear to [him] that she had any legal basis to deny [Jeff's] request" to withdraw the funds from the retirement account.

Oleson largely admits to making these statements to Dupree but asserts that they were not false because he technically told her the truth. Oleson maintains, as he did in the *Katseanes* appeal, that the QDRO was not in effect at the time of the phone call because the district court had not yet signed the order. Oleson testified to the Committee that he did not tell Dupree that there was "*going to be no QDRO.*" **(**Emphasis added). In other words, because he believed the QDRO was not yet effective, he was being truthful when he told Dupree that there were no *current* holds on the retirement funds; thus, he satisfied his ethical duty. Oleson opined that if Dupree had wanted to know whether there was *going to be* a QDRO imposed sometime in the future, she should have asked the question more precisely. He testified:

> They [Rudd & Company] are not my client. I don't give them advice. I never misrepresented anything. I answered their questions. I answered the questions truthfully. *Now, if they didn't ask the right question, that's not my problem. If they inferred things based upon my answers, that is not my problem.*
> . . .
> I don't give them legal advice. I'm not required to tell them everything that's going on.

(Emphasis added.)

Oleson continues to maintain on appeal that by engaging in this semantic gamesmanship, he did not lie to Dupree about the status of the QDRO. Thus, he asserts that he never misled her by failing to volunteer the vital fact that the district court had already orally ordered the QDRO. Accordingly, he asks us to conclude that the omission of this material fact to Dupree was not an ethical lapse on his part because it was her own fault for not asking "the right question." We decline the invitation to disregard both the letter and the spirit of an attorney's duty under Rule 4.1.

In its Decision, the Committee concluded that there was not clear and convincing evidence that Oleson made false or misleading statements to Dupree. However, its reasoning for reaching this conclusion is flawed. The Committee acknowledged that Oleson told Dupree that there was

---

[3] The Committee took judicial notice of the transcript.

not a QDRO entered yet, which was consistent with Oleson's argument to this Court on appeal of the *Katseanes* case (where he maintained that the oral order by the court was ineffective). However, the Committee then noted that Dupree did not testify in the current proceeding, and that the phone conversation "was not explored, *nor was there an explanation as to what [Dupree] relied upon to make the final decision for her company to release the monies to [Jeff]*." (Emphasis added). For this reason, the Committee concluded that the ISB had not met its burden in establishing a violation of Rule 4.1.

We conclude that the Committee's determination is clearly erroneous because the ISB did not need to establish that Dupree *relied* on Oleson's statements at all; it only needed to establish that Oleson made a misleading or false statement to Dupree. Here, the Committee determined that, because there was no explanation "as to what [] Dupree relied upon to make the final decision for her company to release the monies to" Jeff, the ISB did not meet its burden. The Committee's reasoning reads a requirement of reliance into Rule 4.1 that does not exist anywhere in its text. As stated by the ISB, "reliance is inapposite to concluding whether [Oleson]'s representations to Dupree regarding the QDRO status were false and/or contained material omissions under [Rule] 4.1."

The uncontroverted evidence before the Committee demonstrated that Oleson violated Rules 4.1 and 8.4(c). Oleson informed Dupree that there were no holds on the retirement funds, despite the district court granting the QDRO on the funds only days beforehand. Further, Oleson was acutely aware that the district court had granted the motion for the QDRO, as he attended the hearing on the motion and acknowledged that Jeff had lost on the matter. Yet, he subsequently made misleading statements to Dupree about the status of the QDRO—informing her that no holds were in place—despite knowing that the district court had granted the QDRO. His statements were clearly intended to mislead Dupree by omitting a highly material fact—that the court had recently ordered a QDRO within the last few days.

On appeal, Oleson continues to maintain that he believed that the district court's oral grant of the QDRO was not effective until it was signed by the district court; thus, he argues that his statements to Dupree on the phone were technically accurate (i.e., that the QDRO was not yet in effect).This argument is unconvincing for several reasons. First, this Court made it clear in *Katseanes* that the QDRO was effective as soon as the district court orally granted it. *Katseanes*, 171 Idaho at 485, 522 P.3d at 1243. Thus, Oleson's continued assertion that the QDRO was not

effective until signed is plainly incorrect. But more importantly, even if Oleson truly believed that the QDRO was not in effect at the time of the phone call, his failure to inform Dupree that the district court had orally awarded the retirement funds to Judy was still a *material omission*, equivalent to an affirmative misleading statement. Oleson does not dispute that he wholly failed to inform Dupree of the district court's ruling, regardless of whether it was effective on January 6, 2021, or going into effect in the near future. Even if Oleson had a good faith belief that the QDRO was not yet effective on the day he spoke with Dupree, he nonetheless made a knowing omission of material fact: he failed to mention that the court had *granted* the motion for the QDRO designating all the retirement funds to Judy. This omission was blatant and seriously misleading.

We conclude that clear and convincing evidence overwhelmingly demonstrates that Oleson knowingly made misrepresentations, both affirmatively and through omission, of material facts to a third party. This conduct satisfies the requirements of both Rule 4.1 (knowingly making a false statement, or omission, of material fact) and 8.4(c) (engaging in conduct involving dishonesty, deceit, or misrepresentation). Accordingly, the Committee's decision that Oleson did not violate Rules 4.1 and 8.4(c) is clearly erroneous and arbitrary and capricious, and we reverse the Committee's Decision in this regard.

## C. The Committee did not err in concluding that Oleson did not violate Rule 1.3 by failing to act with diligence and promptness.

The Committee determined that there was not clear and convincing evidence that Oleson violated Rule 1.3. On appeal, the ISB asserts that this was clearly erroneous. Rule 1.3 provides that an attorney "shall act with reasonable diligence and promptness in representing a client." I.R.P.C. 1.3.

This allegation arises from the same course of conduct as the previous allegations: Oleson's failure to timely file the accounting with the district court, despite Jeff providing him with the accounting well before the deadline. The ISB contends that Oleson's failure to timely file the accounting that Jeff provided to him violated Rule 1.3's mandate to "act with reasonable diligence and promptness in representing a client." I.R.P.C. 1.3. In making this claim, the ISB contends that "[a] lawyer's failure to timely file documents on behalf of a client violates [Rule] 1.3."

The ISB cites two cases for the proposition that a lawyer violates Rule 1.3 when he fails to timely file claims on his client's behalf. *See Idaho State Bar v. Tway*, 128 Idaho 794, 798, 919 P.2d 323, 327 (1996); *In re Jenkins*, 127 Idaho 408, 901 P.2d 1309 (1995). In each of those cases, an attorney violated Rule 1.3 by failing to timely file a complaint on behalf of their client. The ISB

13

analogizes those cases to the situation here, where Oleson failed to timely file the accounting with the district court. However, upon a close examination of the cases cited by the ISB, they are distinguishable from the present case. In both *Tway* and *In re Jenkins*, it was clear that the client desired and expected their attorney to timely file the relevant claim on their behalf. *Tway*, 128 Idaho at 798, 919 P.3d at 327; *Jenkins*, 127 Idaho at 417, 901 P.2d at 1318. This is different from the situation at hand, where there is conflicting evidence as to whether Jeff instructed Oleson to refrain from filing the accounting, or whether Oleson did so on his own initiative. The Committee did not make a conclusive finding on that issue.

Although the Committee found that Oleson made a "decision not to file [the accounting]," it never determined whether Oleson was acting at Jeff's behest, or on his own accord. Despite Jeff testifying that it was Oleson's decision, the Committee noted that it found Jeff's testimony to be uncredible "at several times" as it related to his communication with Oleson. The result is conflicting evidence in the record about whether Jeff instructed Oleson not to file the accounting, and ultimately, the Committee concluded that there was not clear and convincing evidence to establish that Oleson had failed to act with reasonable diligence and promptness in representing a client.

Here, although there is some competent evidence suggesting that Jeff wanted and expected Oleson to file the accounting, there is not sufficiently clear and convincing evidence to disturb the Committee's determination that Oleson did not violate Rule 1.3. For this reason, we conclude that the Committee's decision that Oleson did not violate Rule 1.3 was not clearly erroneous. We uphold the Committee's Decision in this regard.

**D. The Committee did not err because clear and convincing evidence supports its conclusion that Oleson had a conflict of interest when representing Jeff at the contempt hearing and on appeal, in violation of Rule 1.7(a)(2).**

The Committee next determined that Oleson violated Rule 1.7(a)(2) by representing Jeff while having a concurrent conflict of interest. The ISB alleged that Oleson had a conflict of interest in representing Jeff during the contempt proceedings because it was Oleson's conduct that led to those proceedings.

Rule 1.7(a)(2), which governs conflicts of interest, states:

(a) Except as provided in paragraph (b) a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

. . .

14

> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or third party or by the personal interests of the lawyer, including family or domestic relationships.

I.R.P.C. 1.7(a). However, the Rules allow for a lawyer to represent a client, notwithstanding a conflict of interest, if the lawyer:

> (1) reasonably believes that the lawyer will be able to provide competent and diligent representation of the client;
> (2) the representation is not prohibited by law;
> (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
> (4) each affected client gives informed consent, confirmed in writing.

I.R.P.C. 1.7(b).

In this case, Jeff was charged with contempt for willfully failing to comply with a court order: namely, failing to timely supply the district court with an accounting of the funds he withdrew from his retirement account. *See e.g.*, *Abell v. Abell*, 172 Idaho 531, 544, 534 P.3d 957, 970 (2023) (explaining that a party bringing a contempt charge must prove that the contemnor willfully failed to comply with a court order) (citations omitted). Although Jeff provided the accounting to Oleson well before the court-ordered deadline on April 1, 2021, Oleson ultimately did not file the accounting and, as discussed above, submitted a letter to the court instead. The letter stated that Oleson did "not feel it proper to provide an accounting to the court" and that he did "not believe [Jeff was] required to do so" at the time. Oleson also testified that it was *his* "legal decision" to not file the accounting, further confirming the sentiment stated in the letter. The failure to timely file the accounting directly led to Judy filing a motion to hold Jeff in criminal contempt. Subsequently, Oleson represented Jeff during the contempt hearing; however, Oleson did not assert any defenses on his client's behalf.

The ISB alleged that Oleson had a conflict of interest when he represented Jeff on the motion for contempt, both in the district court and on appeal to this Court, because the motion was based on *Oleson's decision* to refrain from filing the accounting as ordered by the district court. Because evidence indicated that Oleson chose not to file the accounting without consulting Jeff, the ISB contends that Oleson could not raise all defenses available to Jeff without implicating himself in the contempt. This is the very essence of a conflict of interest.

15

In its Decision, the Committee found clear and convincing evidence that Oleson had violated Rule 1.7(a)(2) by representing Jeff with a concurrent conflict of interest. The Committee stated:

> Once the contempt charge was filed, if not earlier, Mr. Oleson should have notified his client of the conflict of interest that he had and obtained informed consent or withdrawn as counsel. He did neither and [Jeff] went to jail for it.

On appeal, Oleson attempts to rebut this conclusion by arguing that he had no "personal interest" in not filing the accounting. Oleson poses a rhetorical question: "what purpose and/or reason would Mr. Oleson have to *not* file the accounting that [Jeff] initially provided to him?" (Emphasis in original). Additionally, Oleson repeatedly contends that Jeff instructed him not to file the accounting, arguing that this fact resolves the issue entirely.

Oleson misperceives the alleged conflicts of interest at hand. The issue here not only concerns whether Oleson had a personal reason "*not* to file the accounting," it also concerns whether a conflict of interest arose because Oleson unilaterally made the legal decision not to file the accounting *and yet continued to represent Jeff* in the contempt proceedings stemming from that very action. Stated another way, because Oleson's own conduct (making the self-attested "legal decision" not to file the accounting) led to the motion for contempt, Jeff should have had a potential defense available to him—that Oleson was solely responsible for the violation of the court order. However, by continuing to act as Jeff's counsel, raising such a defense would not only have required Oleson to fall on his own sword by admitting that he violated the court order, it also would have required him to essentially confess to violating the Professional Rules (failure to abide by client's wishes and submit the accounting)—something Oleson clearly had a personal interest in avoiding. The result is an obvious conflict of interest.

Oleson's repeated assertions that Jeff directed him not to file the accounting, and that he had Jeff's "informed consent to not file the accounting," present similarly flawed reasoning. According to Oleson, Jeff's purported directives explain his reason for not presenting any defenses at the contempt hearing—there was simply none to raise. In other words, he claims he was following his client's directive as required by Rule 1.2. However, the evidence does not support Oleson's assertion that Jeff directed him not to file the accounting. Indeed, Oleson's own testimony indicates that it was his "legal decision" to not file the accounting. In this sense, Oleson has taken inconsistent positions. On the one hand, he testified that it was his own "legal decision" to file the letter with the judge in lieu of the accounting; yet, in the next breath, he asserts that it was Jeff's

decision to do so. However, even if Jeff instructed Oleson not to file the accounting, he was doing so based on Oleson's advice because Oleson (incorrectly) advised Jeff that it was a legally viable option to file the letter instead of responding to the court's order to file an accounting. Thus, whichever version Oleson would have us believe, the violation of the court order would still be traceable to Oleson, implicating his personal interest in the contempt hearing.

Even more concerning to this Court is that Oleson's assertion that he had no "personal interest" in not filing the accounting is patently incorrect. Oleson had a personal interest because *he received payments directly from the retirement funds at issue*. Indeed, after Oleson urged Jeff to make a payment, Jeff used the improperly withdrawn retirement funds to make two payments to Oleson totaling $24,700.[4] The contempt hearing arose directly from the failure to file an accounting, which would have disclosed that Jeff made those payments to Oleson. Oleson even acknowledged that "the judge was going to be upset" that the funds had been withdrawn, yet he accepted the payments anyway. The full extent of these payments would have been disclosed in the accounting that Oleson refused to supply to the court; thus, he had a continued conflict of interest in representing Jeff because his own money was tied up in the controversy.

Finally, Oleson argues that the Committee's conclusion is "premised on the proposition or assumption that [he] was required to disclose [Jeff's] directive under [Rule] 1.6(b)(1) or (b)(3) . . . ." Oleson, in essence, interprets the Committee's decision as requiring him to tell the district court, as a defense to contempt, that Jeff directed him to refrain from filing the accounting. Based on this interpretation, Oleson asserts that he would be unable to reveal his client's directives under Rules 1.2 and 1.6, which concern the necessity of maintaining a client's confidences. However, Oleson incorrectly interprets the Committee's Decision as holding that Oleson was required to reveal Jeff's "directives" to the district court as a defense to the contempt charge. It would not have been a defense to Jeff's contempt charge for Oleson to argue that his client instructed him to withhold the accounting—ironically, that would only be a defense Oleson could raise in response to a later ethics charge. Instead, by his continued representation, Oleson deprived Jeff of the one defense to the contempt charge he could have plausibly raised: that Jeff timely complied with the court's order and expected Oleson to file the accounting, but Oleson failed to do so (which is exactly what Jeff testified happened).

---

[4] Jeff paid $5,700 of that money directly to Oleson, while the other $19,000 was paid through Billie (Jeff's other ex-wife) on his behalf from the $50,000 Jeff paid her.

Because Oleson had an actual conflict of interest in his continued representation of Jeff, Oleson needed to inform Jeff of the conflict and obtain informed consent before continuing the representation. Oleson admits that he never informed Jeff of the conflict, nor obtained his consent to continue the representation. In fact, Oleson still refuses to acknowledge that a conflict ever existed. For these reasons, the Committee's determination that Oleson violated Rule 1.7(a)(2) is supported by clear and convincing evidence and was not clearly erroneous or arbitrary and capricious. Accordingly, we uphold the Committee's Decision in this regard.

**E. The Committee did not err because clear and convincing evidence supports its conclusion that Oleson disobeyed the district court's order and engaged in conduct prejudicial to the administration of justice, in violation of Rules 3.4(c) and 8.4(d).**

Next, the Committee determined that Oleson violated Rules 3.4(c) and 8.4(d) when he violated the court's order to timely file the accounting. Because both violations were based on the same conduct, the Committee addressed both violations together; however, for the sake of clarity, we take each in turn.

**1. Oleson violated Rule 3.4(c).**

Rule 3.4(c) provides that a lawyer shall not "knowingly disobey an obligation under the rules of a tribunal, except for an open refusal based on an assertion that no valid obligation exists." I.R.P.C. 3.4(c). In its complaint, the ISB alleged that Oleson violated Rule 3.4(c) when he knowingly advised Jeff to withdraw his retirement funds "in direct contravention" of the district court's order granting the QDRO. The ISB also alleged that Oleson violated the Rule by failing to timely file the accounting as ordered by the district court, which resulted in Jeff serving a three-day jail sentence for criminal contempt.

Although the Committee found that there was not clear and convincing evidence that Oleson directed Jeff to withdraw the retirement funds in violation of the court order, it concluded that Oleson violated Rule 3.4(c) by failing to timely file the accounting with the court:

> As for not filing the accounting as ordered by the Court, as noted above [Jeff] delivered something to Mr. Oleson that he considered his accounting and that he did so before the April 1 deadline. Mr. Oleson decided to not file the accounting by the deadline, directly disobeying an Order from the Court. The fact that he claims his client told him to do so, even if true, is no safe harbor for ignoring the order of the Court. **The Committee does find clear and convincing evidence that Mr. Oleson violated Rule 3.4(c).**

(Emphasis in original).

On appeal, Oleson claims that his actions were protected by other Rules and, thus, precluded the Commission from finding that he violated Rule 3.4(c). Specifically, Oleson asserts that he was not only required to abide by Jeff's directions, but he was also required to refrain from disclosing such directives to the district court to maintain confidentiality. Oleson cites Rule 1.2(a), which states that:

> Subject to paragraphs (c) and (d), a lawyer shall abide by a client's decisions concerning the objectives of representation and, as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation.

I.R.P.C. 1.2(a). Additionally, Rule 1.2 makes it clear that a lawyer "shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent . . . ." I.R.P.C. 1.2(b). Oleson asserts that Jeff directed him not to file the accounting; therefore, Rule 1.2 required him to abide by Jeff's directive. Although Oleson does not cite it, he also apparently relies on Rule 1.6, which provides that: "A lawyer shall not reveal information relating to representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation or the disclosure [falls within an enumerated exception]". I.R.P.C. 1.6(a). With these rules in mind, Oleson contends that, as a matter of law, he cannot be found to have violated Rule 3.4(c).

Oleson's argument is unavailing. It is true that lawyers must generally abide by their client's directives. However, it is no excuse to directly violate a court order at the behest of one's client. In his brief, Oleson argues that he cannot be found to have violated Rule 3.4(c) simply because he attempted to comply with Rule 1.2. This argument implicitly assumes that Oleson was required to comply with Rule 1.2 at the expense of violating Rule 3.4(c). Yet, this is a mistaken assumption because a lawyer is required to comply with all the Rules. Non-attorney clients are often uninformed about the law and its requirements; it is the duty of an attorney to explain the law and set boundaries on the potential courses of action, limited by the law itself, as well as the Professional Rules. If a client directs a lawyer to violate the law or a Rule, the lawyer should explain to the client why such action is impermissible. If the client continues to insist on the action nonetheless, it is incumbent on the attorney to withdraw. *See* I.R.P.C. 1.16 ("a lawyer . . . shall withdraw from the representation of a client if: (1) the representation will result in violation of the rules of professional conduct or other law[.]"; *see also* I.R.P.C. 1.16, cmt. 2 ("A lawyer ordinarily must decline or withdraw from representation if the client demands that the lawyer engage in

19

conduct that is illegal or violates the Rules of Professional Conduct or other law."). An attorney cannot violate a court order or break the law simply because the client desires the lawyer to do so. Oleson complains that he had no choice but to violate at least one Rule, but this false dichotomy exists only because of Oleson's misinterpretation of the Rules and misperception of the circumstances before him.

We take this opportunity to stress that the Professional Rules relating to client confidentiality are for the client's benefit—they are not a shield for an attorney to use to justify violating other Rules. The practice of law is a learned profession. People who are not learned come to attorneys for advice about what they should do and how to best avoid negative consequences. As noted by former Chief Judge Edward Re of the United States Customs Court, being an attorney is well described as "answer[ing] a calling [] to enter a ministry, a ministry of justice whose members are committed to the rendering of service to attain the peaceful and just resolution of disputes." Edward D. Re, "*The Profession of the Law*," Journal of Civil Rights and Economic Development, Vol. 15, Winter 2000, Issue 2 Article 1 (St. John's University School of Law).

To be clear, attorneys are not mercenaries who must do their client's bidding without question. In fact, attorneys often must protect clients from their own bad choices. When confronted with a request that would result in a violation of the Rules of Professional Conduct, an attorney should not simply comply with the request and then hide behind other rules. Instead, they should inform and advise their client what they are ethically permitted to do and then counsel them to select a permissible course of action. If they cannot succeed in doing so, the attorney should follow the Rules and withdraw from the representation. I.R.P.C. 1.16. When a challenging ethical issue arises, attorneys are encouraged to seek guidance from Bar counsel and other knowledgeable attorneys.

Here, Oleson cannot avoid accountability for violating a court order by claiming that he was merely following Jeff's instructions. As a member of a learned profession, he must abide by a much higher standard. Simply put, the Professional Rules must serve as an attorney's ethical compass—not the directives of his client. We conclude that the Committee's determination that Oleson violated Rule 3.4(c) is based on clear and convincing evidence and is not clearly erroneous or arbitrary and capricious. Accordingly, we uphold the Committee's Decision in this regard.

## 2. Oleson violated Rule 8.4(d).

Rule 8.4(d) provides that it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice." I.R.P.C. 8.4(d). The ISB contends that Oleson violated Rule 8.4(d) by advising Jeff to withdraw the funds in contradiction to the court's order, as well as failing to timely file the accounting, because it led to the district court expending additional time and resources "addressing the resulting motions to compel and motions [for] contempt filed against Jeff." It also prejudiced the efforts of his ex-wife and opposing counsel to obtain justice by wasting time, needlessly consuming resources, and circumventing the district court's orders. Based on Oleson's actions, his own client was also ordered to pay attorney fees and costs related to the two motions and served jail time for criminal contempt.

The Committee found that Oleson violated Rule 8.4(d) and that his conduct was "certainly prejudicial to the administration of justice." The Committee stated:

> Here [Oleson] not only provided misguided direction that a QDRO was not entered on January 6, but he also failed to file the hand-written "accounting" his client had provided to him, then failed to notify him of his conflict of interest in representing him through the contempt proceedings in silence. The Court was forced to press and press for compliance, necessitating multiple hearings and an unnecessary waste of judicial resources. While the panel notes IRPC 1.2(d) and comment (13) to that rule casts a shadow on the conduct in this case, it does not afford relief to Mr. Oleson for his conduct as noted above. Argument made to IRPC 1.6 (confidentiality) also do not provide a safe harbor for Mr. Oleson's conduct. Specifically applicable are the exceptions to the "shall not reveal" mandate most notably subsections (b)(1) and (b)(3). **The panel did find clear and convincing evidence that Mr. Oleson violated Rule 8. 4(d) by his conduct in this case.**

(Emphasis in original). Stated more simply, the Committee found that Oleson violated Rule 8.4(d) in three distinct ways: by providing misguided directions about the status of the QDRO; by failing to file the accounting provided to him by Jeff; and by failing to notify Jeff of his conflict of interest.

Oleson again argues that Rule 1.2 required him to abide by Jeff's purported directive to not file the accounting, thereby protecting him from violating other Rules, such as Rule 8.4(d). However, as explained above, Rule 1.2 does not provide Oleson with a free pass to violate Rule 8.4(d), or any other Rule. Accordingly, Oleson's argument is again for naught.

Oleson also takes issue with the Committee's reference to Rule 1.6 (which, as explained above, deals with client confidentiality) and the conclusion that it did not provide a safeguard to Oleson's actions in this instance. According to Oleson, this again reflected the Committee's "apparent position" that Oleson was "required to disclose his client's directives under [Rule] 1.6",

which Oleson asserts is incorrect. However, nothing in the Committee's Decision held that Oleson was required to disclose any confidential communications Jeff made to him. Instead, the Committee concluded that Oleson engaged in conduct that was prejudicial to the administration of justice by 1) providing misguided directions about the status of the QDRO to Rudd & Company; 2) failing to file the accounting provided to him by Jeff; and 3) failing to notify Jeff of his conflict of interest. We agree. Oleson could have refrained from such conduct without disclosing Jeff's confidential communications. Indeed, Oleson provides no explanation for why he was required to disclose Jeff's directives under the Committee's holdings.

Again, Oleson cannot claim that he was merely following Jeff's instructions as an excuse for him to violate a direct court order. Additionally, nothing in the Committee's Decision implied that Oleson was required to break client confidentiality. We conclude that the Committee's determination that Oleson violated Rule 8.4(d) was supported by clear and convincing evidence and was not clearly erroneous or arbitrary and capricious. Accordingly, we uphold the Committee's determination in this regard.

## F. The Committee did not err by taking judicial notice of the items presented in the ISB's brief.

After the evidentiary hearing, the Committee asked the parties to file closing arguments. They were also informed that they could supplement the record by filing a motion requesting that the Committee "take Judicial Notice in accordance with IRE 201" and filing a memorandum in support. The Committee stated that it would "render a decision on any request as part of its Findings of Facts in accordance with IBCR 525(m)."

In response, the ISB filed a motion requesting that the Committee take judicial notice of certain adjudicative facts contained within six exhibits. The exhibits consisted of certified transcripts of hearings from the underlying district court case and the *Katseanes* opinion issued by this Court. Along with its motion, the ISB submitted a memorandum outlining the adjudicative facts within each exhibit and explaining why such facts were relevant to the current proceedings. Oleson submitted a memorandum in opposition to the ISB's motion for judicial notice. Ultimately, the Committee took judicial notice of the requested exhibits in its Decision dated March 29, 2024.

Oleson argues on appeal that the Committee abused its discretion by taking judicial notice of the ISB's exhibits for two reasons. First, Oleson argues that the ISB's motion requesting the Committee take such judicial notice was untimely. Second, Oleson argues that the facts contained

22

within the ISB's exhibits were not adjudicative facts subject to judicial notice. For the reasons explained below, we disagree.

### 1. Judicial notice was timely taken.

Oleson relies on Idaho Rule of Civil Procedure 7(b)(3)(a) for his assertion that the ISB's motion for judicial notice was untimely. This is a general rule that provides when an attorney files a motion, the notice of hearing must be filed two weeks prior to the designated hearing date. I.R.C.P. 7(b)(3)(a). In this case, because the ISB made its motion for judicial notice *after* the evidentiary hearing, Oleson asserts it is untimely. However, Oleson forgets that it was the Commission that invited the parties to file a motion—not the ISB—and it did so pursuant to its own rules. Therefore, he cannot claim that the request was "untimely."

Regardless, the Idaho Rules of Civil Procedure are generally inapplicable to disciplinary cases. *See* I.B.C.R. 525(b) ("Except as specifically adopted or referred to in these Rules, the provision of the Idaho Rules of Civil Procedure shall not apply in disciplinary cases"). Because the section of the Rules dealing with reviews of professional conduct do not specifically address or adopt the Idaho Rules of Civil Procedure, they are inapplicable here. *Id.*; *see also* I.R.E. 201(d) (providing that motions may be made during a hearing or trial).

Moreover, both the Idaho Rules of Evidence and the Idaho Bar Commission Rules make clear that facts are judicially noticeable at any time during a proceeding. Idaho Rule of Evidence 201(d) provides that a "court may take judicial notice at any state of the proceedings." I.R.E. 201(d). Likewise, Idaho Bar Commission Rule 525(m) states that a Hearing Committee may take judicial notice of facts "either at the time of the hearing *or at the time of declaring its findings of fact*, whichever it deems appropriate." I.B.C.R. 525(m) (Empasis added).

In this case, Oleson simply asserts that taking judicial notice at the time of issuing its findings of fact was inappropriate; however, he never explains why that is the case. Importantly, Idaho Bar Commission Rule 525(m) states the Committee may take judicial notice when "*it* deems it appropriate", not when a *party* deems it appropriate. Here, Oleson simply complains that he was unfairly disadvantaged by the Committee's decision to take judicial notice of the ISB's exhibits. However, he stops short of proffering a cogent argument as to why the Committee's actions were improper in any way, especially where he failed to object at the time the Commission invited the parties to supplement the record. Accordingly, we conclude that the Committee did not abuse its discretion as to the timing of the judicial notice taken in this case.

23

## 2. The facts judicially noticed by the Committee were adjudicative facts and were sufficiently identified by the ISB.

Oleson next argues that the ISB did not identify the "adjudicative facts" contained within the exhibits with sufficient specificity to make judicial notice appropriate. Oleson also maintains that the ISB used the judicial notice process to improperly sneak in evidence that was not admitted during the evidentiary hearing.

Idaho Rule of Evidence 201(b), which governs judicial notice of adjudicative facts, sets forth the kinds of facts that may be judicially noticed: "The court may judicially notice a fact that is not subject to reasonable dispute because (1) it is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." I.R.E. 201(b). In certain circumstances, judicial notice is mandatory, as opposed to permissive: a court "must take judicial notice if a party requests it and the court is supplied with the necessary information." I.R.E. 201(c)(2). The rule also provides guidelines for taking judicial notice of court records, exhibits, and transcripts:

> When a court takes judicial notice of records, exhibits, or transcripts from the court file in the same or a separate case, the court must identify the specific documents or items so noticed. When a party requests judicial notice of records, exhibits, or transcripts from the court file in the same or a separate case, the party must identify the specific items for which judicial notice is requested or offer to the court and serve on all parties copies of those items.

I.R.E. 201(c).

An adjudicative fact is "[a] controlling or operative fact, rather than a background fact; a fact that concerns the parties to a judicial or administrative proceeding and that helps the court or agency determine how the law applies to those parties." *State v. Lemmons*, 158 Idaho 971, 974, 354 P.3d 1186, 1189 (2015) (quoting *Black's Law Dictionary* 610 (Bryan A. Garner ed., 7th ed., West 1999)). On the other hand, legal facts are those that concern the state of the law itself, i.e., stating "what the law is." *Id.* Said another way, adjudicative facts shed light on what happened in a particular case, while legal facts bear on questions of what the law is, or should be. *Id.*

We have noted that "judicial notice is intended to preserve judicial efficiency by recognizing facts that are easily and objectively verifiable." *Id.* at 979, P.3d at 1194. As a result, those requesting judicial notice must be specific in their requests and must "supply[] the court with a specific reference to the adjudicative fact or facts contained in the designated record, exhibit, or

transcript that is relevant to the cause of action or specific claim before the court." *Rome v. State*, 164 Idaho 407, 414, 431 P.3d 242, 249 (2018).

In *State of Idaho, Department of Health and Welfare v. Doe (2023-2024)*, this Court addressed the specificity required for identifying the adjudicative facts that a party is requesting be judicially noticed. 172 Idaho 891, 900-01, 537 P.3d 1252, 1260-61 (2023). We distinguished between simply requesting that the court take notice of an entire case file and identifying specific documents within a case. *Id.* In *Doe (2023-2024)*, the State requested judicial notice of specific documents from a case file: the "adjudicatory decrees and oral findings of facts made at the respective adjudicatory hearings." *Id.* We held that the State's request was sufficiently specific and satisfied Idaho Rule of Evidence 201. *Id.* We also concluded that the facts noticed were "not subject to reasonable dispute" and could be "accurately and readily determined" from the documents; moreover, the facts were adjudicative because they were controlling, operative, and "concern[ed] the parties to a judicial or administrative proceeding[.]" *Id.* As a result, judicial notice was appropriate. *Id.* (citing *Bass*, 171 Idaho at 704-05, 525 P.3d at 742-43).

Here, five of the exhibits judicially noticed by the Committee were transcripts of hearings from the underlying *Katseanes* case, and the final exhibit was the opinion rendered by this Court in the appeal of the same case. In its supporting memorandum, the ISB identified with specificity the adjudicative facts contained within each exhibit that it was requesting be noticed, and explained why such facts were relevant. The ISB identified the specific lines and paragraphs from each transcript that related to one or more of the allegations in its Complaint. It then spelled out why the facts shed light on specific adjudicatory facts in the present case. Regarding the exhibit containing this Court's opinion in the *Katseanes* case, the ISB quoted specific conclusions made in the opinion, and explained how they were relevant to the case at hand.

Based on our review of the record, we conclude that the ISB complied with IRE 201 because it sufficiently explained which facts it was requesting be noticed, as well as how each fact was relevant and shed light on the case at hand. The ISB not only identified the specific documents to be noticed, it also provided a detailed explanation of which parts of each document were pertinent to the case at hand. Additionally, all the adjudicative facts contained are readily determinable and not subject to reasonable dispute, a fact that Oleson does not contest. Moreover, the facts within the exhibits are likewise adjudicative because they are controlling and operative

to the case and concerned the parties at hand. For these reasons, we affirm the Committee's decision to take judicial notice of the information requested by the ISB.

**G. The sanction imposed by the Hearing Committee was inadequate based on the severity of Oleson's conduct, his history, and the absence of evidence in mitigation.**

The ISB has appealed the sanction of a public reprimand imposed by the Committee on Oleson for the three violations it found. The ISB argues that due to the nature and number of Oleson's violations, the impact of his actions on others, his past disciplinary history, and his refusal to offer any evidence in mitigation, a more severe sanction is deserved. We agree.

This determination is subject to a unique standard of review. "In reviewing the recommendations of the Committee with regard to sanctions, this Court determines if the sanctions are clearly erroneous or arbitrary and capricious." *Idaho State Bar v. Clark*, 153 Idaho 349, 359-60, 283 P.3d 96, 106-07 (2012). However, "this Court has discretion over the length of any suspension or other sanction imposed." *Idaho State Bar v. Smith*, 170 Idaho 534, 553, 513 P.3d 1154, 1173 (2022). "Although the Court places great weight on the findings and recommendations of the hearing committee regarding sanctions, 'it is ultimately the responsibility of this Court to determine the sanctions available' to the ISB." *Idaho State Bar v. Frazier*, 136 Idaho 22, 30, 28 P.3d 363, 371 (2001) (quoting *Idaho State Bar v. Tway*, 128 Idaho 794, 799, 919 P.2d 323, 328 (1996)). "This Court must consider the nature of the violations, mitigating and aggravating circumstances, the need to protect the public, the courts and the legal profession, and the moral fitness of the attorney." *Idaho State Bar v. Souza*, 142 Idaho 502, 506, 129 P.3d 1251, 1255 (2006). Additionally, the American Bar Association ("ABA") provides standards for the implementation of sanctions on attorneys who violate the professional rules of conduct, which this Court may consider. *See Pangburn v. Idaho State Bar*, 154 Idaho 233, 237, 296 P.3d 1080, 1084 (2013).

We begin by noting that Oleson has a history of professional misconduct. This Court has long held that an attorney's prior discipline may be considered as an aggravating factor that bears on the appropriate sanction. *See Idaho State Bar v. Malmin*, 139 Idaho 304, 312, 78 P.3d 371, 379 (2003); *Souza*, 142 Idaho at 508, 129 P.3d at 1257. We note that Oleson has been twice disciplined for professional misconduct, with both instances being recent—2020 and 2023. In the first instance, which concerned a probate matter and a frivolous, retaliatory lawsuit Oleson filed against opposing counsel, Oleson was found to have violated Rules 3.1 and 8.4. The ISB imposed a private reprimand as a sanction. In the second instance, which involved his failure to act on a post-divorce motion to recover child support, Oleson was found to have violated Rules 1.2(a), 1.3, and 1.4.

26

Again, the ISB imposed a private reprimand as a sanction. Importantly, in both instances, Oleson was found to have violated at least one of the same rules that he violated in this case. This troubling history demonstrates a pattern of misconduct and shows that Oleson's malfeasance in this case is not an isolated incident. For these reasons, Oleson's history of discipline and pattern of misconduct serve as weighty aggravating factors.

In the same vein, the fact that Oleson has substantial experience in the practice of law is also an aggravating factor. As stated by the ABA, substantial experience in the practice of law is an aggravating factor "because a lawyer with a great deal of experience should know better than to engage in misconduct." Here, Oleson has been practicing law in Idaho for over 23 years, representing clients in both criminal and civil cases. Considering this, he "could hardly have been ignorant of his ethical responsibilities." *Souza*, 142 Idaho at 506, 129 P.3d at 1255. Simply stated, he should know better.

Next, Oleson flatly refuses to acknowledge the wrongful nature of his conduct. At no point has he shown any contrition or remorse; he simply denies *any* wrongdoing and refuses to accept responsibility for his actions. Instead, he attempts to diminish the seriousness of his violations and casts blame on his client, claiming that he was simply following Jeff's directions. In reference to Jeff serving jail time for contempt, Oleson testified that "[j]ail is not that bad" and noted that some clients make the "choice" to serve jail time instead of paying money. Beyond the sheer callousness of Oleson's flippant response to Jeff unnecessarily serving jail time, we find his lack of remorse and personal accountability to be highly aggravating circumstances. *See Smith*, 170 Idaho at 554, 513 P.3d at 1174.

We also conclude that Oleson also had a selfish and dishonest motive for his misconduct, which is a significant aggravating factor. Oleson misled Dupree when he led her to believe there was no QDRO or hold on Jeff's retirement funds that would prevent him from withdrawing the funds. He did so despite being acutely aware of the district court's oral grant of the QDRO, entered just days beforehand. As the ABA notes, false statements "can result in a finding of dishonest or selfish motive." We conclude that this is exactly what occurred here because Oleson profited financially from his misconduct. Oleson had earlier requested to be paid by Jeff, knowing that the only way he could obtain the money was by improperly withdrawing the retirement funds. Oleson admitted that he knew the court would view withdrawing the retirement funds as problematic. Yet, even with that knowledge, instead of holding the funds in his trust account, the funds were

27

deposited directly into his firm's operating account and were spent. This conduct serves as another aggravating factor.

We have previously held that an injury suffered by a client due to an attorney's misconduct is relevant for determining the appropriate sanction: "A lawyer has many responsibilities, but his responsibilities to his client are chief among them. It is appropriate in attorney discipline cases to consider as an aggravating factor the degree of harm suffered by the client." *Souza*, 142 Idaho 506, 129 P.3d at 1255. We reiterate that an attorney's primary role is to protect his client—sometimes even from his client's own bad judgment. Here, Jeff suffered a uniquely serious harm—three days in jail as a result of Oleson's misconduct. We view a client's loss of liberty due to an attorney's unethical actions in the gravest possible light.

Finally, we highlight the fact that Oleson violated the Rules of Professional Conduct in seven discrete ways, based on duties enumerated in Rules 1.2(a), 1.4, 1.7(a)(2), 3.4(c), 4.1, 8.4(c), and 8.4(d). The fact that Oleson violated multiple rules during the same course of action is also an aggravating factor. In sum, this was not a case where counsel made a single, isolated, unethical decision for which he is being repeatedly punished. To the contrary, Oleson made multiple unethical choices at separate times throughout the course of this matter, each of which made things worse for his client.

As the ISB accurately notes, only one mitigating factor applies here: Oleson's willing participation in the disciplinary proceedings. The ISB acknowledges that Oleson timely responded to questions posed by the ISB's investigatory letter and continued to attend and participate in the proceedings before the Committee. However, we note that Oleson did not even attempt to argue that any mitigating factors applied to his conduct, or even dispute that any specific aggravating factors applied to his conduct. Instead, Oleson opted not to "address the facts and issues in the ISB's 'aggravating factors' section" because he believed that the allegations against him did not "support any finding that [he] violated any Rule of Professional Conduct, let alone any violation that warrants the imposition of any sanction."

Moreover, Oleson's arguments to this Court regarding sanctions are wholly unhelpful. Rather than contend with the serious nature of his misconduct, Oleson attacks the ISB's investigation of him by characterizing it as a "witch hunt" based on false and uncorroborated evidence and contends that the entire case was "contrived" against him. In sum, instead of accepting responsibility for his actions and expressing remorse, Oleson now attempts to blame the

ISB for his troubles. To be clear, we conclude that there is no evidence that this was a "witch hunt" against Oleson. The ISB pursued its investigation of Oleson only after receiving a formal grievance filed by Oleson's opposing counsel, who observed his misconduct and reported it. In this sense, the ISB was fulfilling its duty to investigate a formal grievance and protect the public from attorney misconduct.

Oleson also makes the novel and unsupported claim that it was "a violation of Idaho Bar Commission rules for the ISB counsel to 'investigate' anything beyond the scope of the grievance" initially filed by the grievant. Oleson contends that "if there is not a grievance about a violation of the rules of professional conduct, ISB counsel does not have authority, by the applicable rules, to go 'search' for potential, 'additional violations.' " However, Oleson does not cite any rule purporting to limit the scope of the ISB's investigation to the "four corners" of the original grievance. In reality, Oleson's claim misperceives the nature of the ISB's authority. The ISB has the authority to investigate misconduct reported in grievances; if it discovers other violations of the Rules during the course of its investigation, nothing precludes it from taking action based on such a discovery. *See e.g.*, I.B.C.R. § 509.

Finally, Oleson complains about "not [being] provided with an opportunity to respond to most of the allegations in the ISB Complaint *prior* to it being filed by the ISB and [seeing] the ISB's allegations for the first time when he was served with the formal Complaint." *Id*. (emphasis added). Again, Oleson cites no authority supporting his proposition that he was entitled to such pre-complaint notice. *See Bach v. Bagley*, 148 Idaho 784, 791, 229 P.3d 1146, 1152 (2010) ("Where an appellant fails to assert his assignments of error with particularity and to support his position with sufficient authority, those assignments of error are too indefinite to be heard by the Court."). Oleson did get a full opportunity to respond to each allegation contained in the Complaint when he filed his Answer and during the proceedings that followed. Moreover, the record indicates that the ISB gave Oleson notice of the grievance and an opportunity to respond to such allegations before it filed the Complaint.

We have conducted an independent review of the record and carefully considered the nature of the seven violations Oleson has committed. Additionally, we again note that this is Oleson's third disciplinary case since 2020. After considering the mitigating and aggravating circumstances, including Oleson's fitness to practice law, we conclude that the Committee's recommended sanction, a public reprimand, is arbitrary and capricious because it is far too lenient

29

for this level of misconduct and is insufficient to adequately protect the public, the courts, and the legal profession. Instead, we conclude that the appropriate sanction for Oleson in this case is disbarment.

We recognize the seriousness of this sanction and are mindful of the consequences for Oleson. This is not a result that was reached lightly. Only after much discussion and reflection have we determined that disbarment is appropriate in this instance because Oleson's violations of the Professional Rules of Conduct were not only egregious of themselves, but also resulted in significant harm to his client and others. Oleson's actions were a deliberate attempt by an officer of the court to frustrate justice by undermining a judge's rulings, rendering his actions an affront to the rule of law, the legal profession, and to the reputation of those who ethically engage in the practice of law.

**H. Oleson is not entitled to attorney fees on appeal.**

Oleson makes a one-sentence request for attorney fees under Idaho Code section 12-121 in his reply brief, alleging that the ISB pursued the matter frivolously because the allegations against him were unreasonable and without merit. Oleson has provided no further support for this claim and makes no cogent argument on the matter. Additionally, we have determined that the ISB prevailed on all but one of the issues presented in this appeal. Therefore, Oleson is not entitled to attorney fees.

## IV. CONCLUSION

Based on the foregoing, and pursuant to Idaho Bar Commission Rule 506 and this Court's inherent authority over Bar matters, we conclude and order as follows:

1. The Committee's decision to take judicial notice of the documents presented by the ISB is AFFIRMED;

2. The Committee's determination that Oleson did not violate Rules 1.2(a), 1.4, 4.1, and 8.4(c) is REVERSED;

3. The Committee's determination that Oleson violated Rules 1.7(a)(2), 3.4(c), and 8.4(d) is AFFIRMED;

4. The Committee's determination that Oleson did not violate Rule 1.3 is AFFIRMED;

5. The Committee's decision to issue a public reprimand is VACATED;

6. Effective immediately, Oleson is DISBARRED from the practice of law in Idaho;

7.  Oleson may not apply for readmission to the Idaho Bar for a period of five years from the effective date of the opinion as per Idaho Bar Commission Rule 506(a); and

8.  Oleson's request for attorney fees is DENIED.

Justices BRODY and MEYER, and Justices pro tem TROUT and BURDICK, CONCUR